*584 OPINION
BYBEE, Circuit Judge:
This suit arises out of the 1998 bombing of a Colombian village by members of the Colombian Air Force (CAF). Plaintiffs,[1] citizens and former residents of Colombia, brought suit in California against two U.S.headquartered corporations, Occidental Petroleum and AirSean, for their alleged complicity in the bombing. In two opinions issued in 2005, the district court first refused to dismiss the case on grounds of forum non conveniens and international comity, Mujica v. Occidental Petroleum Corp., 381 F.Supp.2d 1134 (C.D.Cal.2005) (“Mujica I”), but then granted Defendants’ motion to dismiss all of the claims under the political question doctrine. Mujica v. Occidental Petroleum Corp., 381 F.Supp.2d 1164 (C.D.Cal.2005) (“Mujica II”).
In a prior appeal, we declined to decide the issues presented and remanded the case to the district court for two purposes: first, “to consider whether a prudential exhaustion requirement applies in this case, and if so, whether that requirement bars any claims in this case,” and, second, to “consider the effect, if any,” of two Colombian court opinions related to the bombing. Mujica v. Occidental Petroleum Corp., 564 F.3d 1190, 1192 (9th Cir.2009) (“Mujica III”). On limited remand, the district court found that prudential exhaustion was not required. It also found that, if prudential exhaustion were required, Occidental had met its burden of pleading and proving the availability of local remedies. Mujica v. Occidental Petroleum Corp., Case No. CV-03-2860 (C.D.Cal., Mar. 8, 2010) (‘Mujica IV”). Plaintiffs and Defendants appealed and cross-appealed.
We hold that Plaintiffs lack a valid claim under either the Torture Victim Protection Act (TVPA) or the Alien Tort Statute (ATS). We affirm the district court’s judgment of dismissal with respect to Plaintiffs’ state-law claims, but we do so on the ground of international comity. Although the district court rejected dismissal on that ground, we conclude that the district court abused its discretion by applying the incorrect legal standard in its comity analysis, specifically by concluding erroneously that a “true conflict” between domestic and foreign law is required for the application of international comity in all circumstances. Mujica I, 381 F.Supp.2d at 1155. Guided by the correct standard for the application of comity, and informed by the district court’s findings of fact in Mujica IV regarding the adequacy of Colombia as an alternative forum, we conclude that the state-law claims before us are not justicia-ble under the doctrine of international comity.
I. BACKGROUND
A. The 1998 Bombing
The district court described the facts of the underlying events as follows:
The instant case arises from a bombing that occurred in Santo Domingo, Colombia on December 13, 1998. In 1998, Plaintiffs lived in Santo Domingo. The Defendants, Occidental Petroleum Corp. (“Occidental”) and AirSean, Inc., are both American companies; the former is located in Los Angeles, the latter in Florida. Defendant Occidental operates, as a joint venture with the Colombian government, an oil production facil *585 ity and pipeline in the area of Santo Domingo.
Plaintiffs allege the following relevant facts. Since 1997, Defendant AirSean has provided security for Defendant Occidental’s oil pipeline against attacks from left-wing insurgents. Prior to 1998, Defendants worked with the Colombian military, providing them with financial and other assistance, for the purpose of furthering Defendant Occidental’s commercial interests. On several occasions during 1998, Defendant Occidental provided Defendant AirSean and the Colombian military with a room in its facilities to plan the Santo Domingo raid. Defendant AirSean and the Colombian Air Force (“CAF”) carried out this raid for the purpose of providing security for Defendant Occidental (i.e., protecting its oil pipeline) and was not acting on behalf of the Colombian government. During the raid, three of Defendant AirScan’s employees, along with a CAF liaison, piloted a plane with CAF markings and that was paid for by Defendant Occidental. From this airplane, Defendant AirSean provided aerial surveillance for the CAF, helping the CAF identify targets and choose places to deploy troops.
On December 13, 1998, residents of San-to Domingo saw low-flying CAF helicopters overhead and attempted to communicate that they were civilians by lying down on the road and covering then-heads with white shirts. Soon thereafter, several witnesses saw an object (or several objects) drop from one of the CAF helicopters. One of the cluster bombs dropped by the CAF exploded directly in the town of Santo Domingo, destroying homes and killing seventeen civilians and wounding twenty-five others. Of the seventeen killed, six were children. During the attack, the CAF helicopters knowingly fired on civilians attempting to escape and on those who were trying to carry the injured to a medical facility. Soon thereafter, other CAF troops entered the town, blocked civilians from leaving, and ransacked their homes.
While the purpose of the Santo Domingo raid was to protect Defendant Occidental’s pipeline from attack by left-wing insurgents, no insurgents were killed in the attack. These insurgents were located at least one to two kilometers outside of Santo Domingo. Defendants knew that the insurgents were not in Santo Domingo but carried out the attack nonetheless.
Mujica II, 381 F.Supp.2d at 1168-69 (internal citations omitted).
B. Proceedings in Colombian Courts
The 1998 Santo Domingo bombing led to two legal actions in Colombia: a criminal action brought by the Colombian government against three CAF officers who were allegedly responsible for the bombing and a civil suit brought by Plaintiffs (and several other persons) against the government of Colombia.
1. Criminal Action
The Colombian Public Prosecutor’s Office opened a preliminary investigation into the Santo Domingo bombing the day after it occurred, on December 14, 1998. On September 21, 2007, in In re Cesare Romero Pradilla, et al., the Twelfth Criminal Court of the Circuit of Bogota, Colombia convicted three CAF officers of manslaughter. On September 24, 2009, the same court affirmed the verdict on remand from a higher court, finding that all three defendants were guilty of manslaughter and related crimes. The court then sentenced two of them to no more than 380 months’ imprisonment and one to no more than seventy-two months’ imprisonment. *586 The court also imposed fines on all three defendants.
2. Civil Action
On September 25, 2000, Plaintiffs (and others) filed a complaint against the Republic of Colombia, the Colombian Ministry of Defense, the Colombian Army, and the CAF, in regional court in Arauca, the region in Colombia where Santo Domingo is located. Plaintiffs sought damages for wrongful death and physical and psychological injuries to Plaintiffs and their relatives. On May 20, 2004, the Arauca court entered judgment in favor of Plaintiffs and awarded damages amounting to about $700,000. On December 13, 2007, in Mario Galvis Gelves, et al. v. The Nation, a Colombian appellate court approved a settlement between Plaintiffs and the Colombian government, holding that “[t]he liability of the defendant can be found, because the incident that gave rise to the settlement has been proven.” On April 27, 2009, the Director of Legal Affairs of the National Defense Ministry directed the payment of 1,393,649,934.73 Colombian pesos (roughly $737,000) to the victims through their attorney. Nothing in the record suggests that the victims did not receive that settlement payment.
C. Proceedings Below
While the Colombian litigation was ongoing, Plaintiffs filed a complaint in United States district court on April 23, 2003. The complaint, as amended, brought claims for extrajudicial killing; torture; crimes against humanity; cruel, inhuman, and degrading treatment; and war crimes under the Alien Tort Statute (ATS), 28 U.S.C. § 1350, and the Torture Victims Protection Act (TVPA), 28 U.S.C. § 1350 Note. Plaintiffs also filed state law claims for wrongful death, intentional infliction of emotional distress, negligent infliction of emotional distress, and violations of California Business & Professional Code § 17200. See Mujica II, 381 F.Supp.2d at 1169, 1176.
In January 2004, the district court requested the views of the U.S. Department of State. Id. at 1169. In April 2004, the Department of State submitted a Statement of Interest (SOI) indicating that it did not have a position on the foreign policy implications of the action. Id. Eight months later, however, the Department of State submitted a second SOI indicating that it now opposed the litigation as adverse to U.S.-Colombian relations. The Department of State attached to the SOI two short démarches[2] from the Government of Colombia opposing the litigation. Id. In June 28, 2005, the court issued two opinions responding to Occidental’s motion to dismiss the suit.
1. Mujica I — Forum, Non Conveniens and International Comity
In Mujica I, 381 F.Supp.2d at 1134, the district court denied Occidental’s motion to dismiss based on forum non conveniens and international comity. Id. at 1163-64. With respect to forum non conveniens, the district court concluded that, despite a May 2004 civil verdict against the Republic of Colombia in favor of these plaintiffs in Colombian regional court, Colombia was an inadequate forum for Plaintiffs’ claims. The court found that because the plaintiffs had received relief in Colombia, in a suit that did not include Defendants, “these Plaintiffs [would] not be able to recover against these Defendants.” Id. at 1148. According to the district court, “Colombia would be an inadequate forum because *587 Plaintiffs could not obtain a remedy against Defendant as they could in this Court.” Id.
With regard to comity, which the court analyzed alongside the related doctrine of international abstention, the court held that it did not apply. It adopted Plaintiffs’ argument that “at least in the Ninth Circuit, the application of international comity is generally limited to cases where there is a ‘true conflict’ between domestic and foreign law.” Id. at 1155. Under that standard, the court explained that there was no “true conflict” between United States law and Colombian law: “Since the Court has not made any findings of liability or provided any remedies, there is no present conflict between the Court’s proceeding with the instant case and any proceedings in Colombia.” Id. at 1156. The district court acknowledged that there was “the possibility of an inconsistency between a future, potential judgment of this Court and a judgment of a Colombian court,” id., but the court refused to dismiss the suit “without the knowledge that Plaintiffs have an alternative forum in which they are able to obtain a remedy.” Id. at 1163— 64.
2. Mujica II — Political Question Doctrine
In a second opinion issued the same day, Mujica II, 381 F.Supp.2d at 1164, the district court considered whether to dismiss various claims under the TVPA, the ATS, the foreign affairs doctrine, the act of state doctrine, and the political question doctrine. Although the court worked its way through all of these statutes and doctrines and would have dismissed some but not all of Plaintiffs’ claims, it ultimately concluded that the entire suit warranted dismissal under the political question doctrine. Id. at 1195; see also Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).[3]
The district court held that two Baker factors supported dismissal of the suit— factor four, “impossibility of a court’s undertaking independent resolution [of the issue] without expressing lack of the respect due coordinate branches of government,” and factor five, the “unusual need for unquestioning adherence to a political decision already made.” Baker, 369 U.S. at 217, 82 S.Ct. 691. In reaching that conclusion, the court “focus[ed] on the Supplemental Statement of Interest,” Mujica II, 381 F.Supp.2d at 1191, and found that its assertion that U.S. foreign policy “would be negatively impacted by proceeding with the instant case” supported a finding that “proceeding with the litigation would indicate a ‘lack of respect’ for the Executive’s preferred approach of handling the Santo Domingo bombing and relations with Colombia in general.” Id. at 1194. In a footnote, the court wrote that “[f]or similar reasons, the fifth Baker factor, adherence to a policy decision, would also render the instant case non justicia-ble.” Id. at 1194 n. 25.
*588 3. Mujica III — Limited Remand
Plaintiffs appealed the district court’s order granting Defendants’ Rule 12(b)(6) motion and “further appealed] any and all adverse rulings on issues in the Court’s second order entered on June 29, 2005, ... [and] further appealed] any and all prior rulings adverse to Plaintiffs.” On July 27, 2005, Occidental filed a ‘‘notice of conditional cross-appeal,” appealing the district court’s denial of Defendants’ motion to dismiss the action on forum non conveniens and international comity grounds, as well as any adverse judgment in the court’s ruling granting Defendants’ Rule 12(b)(6) motion. AirSean filed a nearly verbatim cross-appeal the next day.
In March 2006, during the pendency of the appeal, the United States filed an ami-cus brief on behalf of Defendants urging affirmance “[bjecause adjudication of this case would adversely affect the United States’ foreign policy interests.” And while it agreed with the ultimate disposition of the case on political question and preemption grounds, it also believed “that dismissal of the plaintiffs’ claims is most appropriate as a matter of international comity.”
In May 2009, we remanded the case to the district court in an order that reads, in its entirety, as follows:
In light of the intervening authority of Sarei v. Rio Tinto, 550 F.3d 822 (9th Cir.2008) (en banc) [“Sarei II”], this case is remanded to the district court to consider whether a prudential exhaustion requirement applies in this case, and if so, whether that requirement bars any claims in this case. On remand, the district court should also consider the effect, if any, of the decision of the Council of State of the Republic of Colombia in Mario Galvis Gelves, et al. v. The Nation, slip op. (Council of State, Rep. of Colombia, Ad. Law Div., Sec. 3, Dec. 13, 2007) and the decision of the Court No. 12 for Criminal Matters of the Circuit of Bogot[a] of the Republic of Colombia in In re Cesare Romero Pradilla, et al., slip op. (Sept. 21, 2007).
Mujica III, 564 F.3d at 1190.
4. Mujica TV — Prudential Exhaustion and the Colombian Cases
By the time we heard the appeal in Mujica III, the original district court judge, Judge William J. Rea, had passed away. Accordingly, on remand, the case was assigned to Judge George H. Wu, who, in accordance with our order, issued a “Ruling on Limited Remand as to the Prudential Exhaustion Issue.”
In response to our first question, the district court held that “there is a sufficiently strong nexus between the claims asserted in this lawsuit and the United States that local exhaustion should not be required.” The court found that, “even if the nexus [to the United States] were held to be weak, ... Occidental ha[d] not shown that the claims in this case do not implicate matters of universal concern,” such as “war crimes and indiscriminate violent assaults on people at large.” Thus, “Occidental ha[d] not shown that those claims against Defendants in this case [were] likely to be subject to an exhaustion requirement.”
The court then addressed the second question we had posed on remand: the effect of the successful civil and criminal litigation brought in Colombia. Judge Wu came to a different conclusion from Judge Rea. Judge Wu held that remedies were available in Colombia, whether their availability was “assessed as of now or as of 2003 when the case was filed” and that, despite Judge Rea’s contrary conclusion, Occidental “seem[ed] to have met its initial burden of showing the availability of local remedies.” The court noted that Dr. *589 Fernando Hinestrosa, Occidental’s Colombian law expert, “stated that Plaintiffs could bring a suit against Occidental today in Colombia, and could have brought one in September 2000, or any time in between. Occidental ha[d] consented to jurisdiction in Colombia, and the statute of limitations under Colombian law ha[d] not yet run.” The district court also found Plaintiffs’ arguments that it was unsafe for them to pursue the litigation in Colombia unavailing, because Occidental showed that Plaintiffs had pursued litigation in Colombia “for years” and had traveled there, even though they now live elsewhere. Furthermore, Plaintiffs had not shown that their physical presence in Colombia was required to pursue the litigation. Accordingly, “[i]f exhaustion were required, Occidental would probably prevail on its demonstration of the availability of local remedies and the lack of futility.” The court concluded that prudential exhaustion was not required in the case, and if it were to impose such a requirement, “it would find that Defendant Occidental ha[d] met its burden of pleading and proving the availability of local remedies and Plaintiffs’ failure to exhaust them.”
On April 7, 2010, Defendants AirScan and Occidental filed essentially identical “Notice[s] of Conditional Appeal,” which noted that “[b]y declining to impose an exhaustion requirement on limited remand, the district court’s Order on Remand leaves unchanged the prior judgment of dismissal with prejudice in this case, and thereby effectively re-enters that judgment as of the date of entry of the Order on Remand.” On April 19, 2010, Plaintiffs filed a “Notice of Cross-Appeal” challenging the district court’s March 8, 2010 ruling.
II. STANDARD OF REVIEW
Dismissal for failure to state a claim under Rule 12(b)(6) is reviewed de novo. Stone v. Travelers Corp., 58 F.3d 434, 436-37 (9th Cir.1995). In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all factual allegations in the Complaint and draw all reasonable inferences in favor of the nonmoving party. Silvas v. E*Trade Mortg. Corp., 514 F.3d 1001, 1003 (9th Cir.2008).
We review the district court’s decision regarding international comity for abuse of discretion. See Allstate Life Ins. Co. v. Linter Grp. Ltd., 994 F.2d 996, 999 (2d Cir.1993); Remington Rand Corp-Del. v. Bus. Sys. Inc., 830 F.2d 1260, 1266 (3d Cir.1987). We follow a two-part test to determine whether a district court abused its discretion. See United States v. Hinkson, 585 F.3d 1247, 1261 (9th Cir.2009) (en banc). “[T]he first step of our abuse of discretion test is to determine de novo whether the trial court identified the correct legal rule to apply to the relief requested. If the trial court failed to do so, we must conclude it abused its discretion.” Id. at 1261-62 (footnote omitted). If the district court identified the correct legal rule, we move on to the second step of the test and “determine whether the trial court’s application of the correct legal standard was (1) ‘illogical,’ (2) ‘implausible,’ or (3) without ‘support in inferences that may be drawn from the facts in the record.’ ” Id. at 1262 (quoting Anderson v. City of Bessemer City, North Carolina, 470 U.S. 564, 577, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).
III. APPELLATE JURISDICTION
Defendants question whether Plaintiffs’ April 19, 2010, notice of appeal following the district court’s decision on remand was timely and, accordingly, whether we have jurisdiction under 28 U.S.C. § 1291. Defendants argue that the district court’s *590 March 8, 2010, ruling “triggered the 30-day clock for Plaintiffs to file their notice of appeal” under Federal Rule of Appellate Procedure 4(a).[4] And since “the district court’s ruling left intact a dismissal with prejudice, Defendants on April 7, 2010 timely filed conditional notices of appeal.” They cite Abbs v. Sullivan, 963 F.2d 918 (7th Cir.1992), which held that there is no appellate jurisdiction if a party without standing is the only party to file an appeal within thirty-days of the final judgment, even if the other party files a cross-appeal within fourteen days of the appeal by the party without standing. Id. at 925. Defendants also cite Stephanie-Cardona LLC v. Smith’s Food & Drug Centers, Inc., 476 F.3d 701, 705 (9th Cir.2007), in which we held that a “late notice of cross-appeal is not fatal- because the court’s jurisdiction over the cross-appeal derives from the initial notice of appeal.” But if a court lacks jurisdiction over an appeal, “it necessarily lacks jurisdiction over the cross-appeal,” and the cross-appeal must be dismissed. Id.
Defendants have misapprehended the limited nature of our original 2009 remand. In that order, we neither addressed any of the issues raised by Plaintiffs’ appeal nor vacated the June 28, 2005, district court order dismissing the case. See Mujica III, 564 F.3d at 1192. Instead, we remanded the ease for two specific purposes: for fact-finding on the applicability of the prudential exhaustion doctrine, see Sarei II, 550 F.3d at 822, and for consideration of the effect of the Colombian criminal and civil cases related to this litigation. Id. The district court understood our order as a limited remand. Its Order is entitled “Ruling on Limited Remand as to the Prudential Exhaustion Issue.” And the parties understood it to be limited as well. Defendants titled their brief “Opening Brief on Limited Remand from the Ninth Circuit,” and Plaintiffs titled theirs “Plaintiffs’ Response to Defendants’ Opening Brief on Limited Remand from Ninth Circuit.” The district court’s 2010 ruling did not state it was reentering the 2005 judgment, and we did not disturb that judgment on remand. Accordingly, after the district court issued its limited ruling, the entire case returned to us. We continue to have jurisdiction under Plaintiffs’ original notice of appeal, filed July 11, 2005. See Richmond v. Chater, 94 F.3d 263, 268 (7th Cir.1996) (observing that appellate courts usually retain jurisdiction when previous panel was unwilling or unable to decide the appeal and remanded the case to tie up loose ends); see also 28 U.S.C. § 1291.
IV. FEDERAL CLAIMS
We have no need to consider whether any prudential doctrines counsel dismissing Plaintiffs’ federal claims under the TVPA and the ATS, as Plaintiffs have no viable claim under either statute.
A. TVPA Claims
The TVPA authorizes a federal cause of action against any “individual” who commits an act of torture or extrajudicial killing “under actual or apparent authority, or color of law, of any foreign nation.” 28 U.S.C. § 1350 Note. In a case decided while this appeal was pending, the Supreme Court examined the TVPA and *591 held that the term “individual,” as used in the statute, “encompasses only natural persons.” Mohamad v. Palestinian Auth., — U.S. -, 132 S.Ct. 1702, 1705, 182 L.Ed.2d 720 (2012). Thus, the TVPA “does not impose liability against organizations.” Id.
Defendants in this case are both corporations rather than natural persons. In light of Mohamad, therefore, Plaintiffs’ TVPA claims must be dismissed. Accord, e.g., Cardona v. Chiquita Brands Int’l, Inc., 760 F.3d 1185, 1188-89 (11th Cir.2014).
B. ATS Claims
The ATS provides that “district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.” 28 U.S.C. § 1350. The ATS “is a jurisdictional statute creating no new causes of action,” although the First Congress adopted it on the assumption that “district courts would recognize private causes of action for certain torts in violation of the law of nations. ...” Sosa v. Alvarez-Machain, 542 U.S. 692, 724, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).
“The question here is not whether petitioners have stated a proper claim under the ATS, but whether a claim may reach conduct occurring in the territory of a foreign sovereign.”[5] Kiobel v. Royal Dutch Petroleum Co., — U.S. -, 133 S.Ct. 1659, 1664, 185 L.Ed.2d 671 (2013). Just as the Supreme Court has clarified the meaning of the TVPA since Plaintiffs filed their complaint, so too has its recent decision in Kiobel refined our understanding of the extent to which the ATS applies extraterritorially. Analyzing Plaintiffs’ ATS claims in light of Kiobel, we conclude that these claims must also be dismissed.
In Kiobel, Nigerian petitioners who later became U.S. residents brought tort claims under the ATS, based on events in Nigeria, against foreign corporations that had only attenuated contacts with the United States — listings on the New York Stock Exchange and an affiliation with a public relations office in New York. See 133 S.Ct. at 1662-63 (majority opinion); id. at 1677-78 (Breyer, J., concurring). The Court found that these ATS claims were barred, holding that “the presumption against extraterritoriality applies to claims under the ATS” and that “nothing in the statute rebuts that presumption.” Id. at 1669.
Although the Court did not hold that plaintiffs may never bring ATS claims based on extraterritorial conduct, it made clear that, in order to be viable, any such claims must “touch and concern the territory of the United States” and “must do so with sufficient force to displace the presumption against extraterritorial application.” Id. Plaintiffs contend that their claims meet this requirement because Defendants are U.S. corporations and because Plaintiffs have alleged that “actions or decisions furthering the [purported] conspiracy” between Defendants and the CAF “took place in the United States.” We disagree.
*592 The allegations that form the basis of Plaintiffs’ claims exclusively concern conduct that occurred in Colombia. For example, Plaintiffs allege that the bombing was planned from an office in Colombia, that employees of Defendant AirScan provided support during the bombing, that Defendant Occidental provided a plane used for targeting in the operation, and that both Defendants gave material and logistical support to the CAF. The only statement before this court that so much as alludes to any conduct within the United States is found in Plaintiffs’ reply brief, filed after Kiobel, in which Plaintiffs point to the allegations in their complaint that Defendants aided and abetted and conspired with the CAF and speculate that some of that conduct, such as the making of the contract between the two Defendants, could have occurred in the United States. Such speculation is not an adequate basis on which to allow Plaintiffs’ claims to go forward.[6] Plaintiffs have the burden of pleading “sufficient factual matter, accepted as true, to ‘state a claim to relief that is plausible on its face,’ ” and a mere conjecture that conduct may have occurred in the United States does not meet that burden. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (emphasis added) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).
In apparent recognition of this defect in their complaint, Plaintiffs have requested leave to amend their complaint in light of Kiobel. The dissent likewise urges us to grant this relief. But although we acknowledge that Kiobel worked a significant change in the legal prerequisites for an extraterritorial ATS claim, and that such intervening changes in the law often warrant granting parties leave to amend, we do not believe that granting Plaintiffs leave to amend would serve any purpose. See, e.g., Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir.1995) (“Futility of amendment can, by itself, justify the denial of ... leave to amend.”).
*593 This is not a case in which the parties have had no opportunity to respond to an intervening change in Supreme Court law. Defendants filed a supplemental brief in the wake of the Kiobel decision urging dismissal of Plaintiffs’ ATS claims, and Plaintiffs devoted 15 pages of their reply brief to Kiobel’s touch-and-concern test. Plaintiffs admitted in that brief that they likely “cannot uncover the evidence they need” to allege “plotting [by Defendants] in the United States without jurisdictional discovery.” Similarly, Plaintiffs’ experienced and knowledgeable counsel candidly represented to the court at oral argument — which was held eleven months after Kiobel was decided — that he could not say that Plaintiffs would be able to amend their complaint to allege acts by the Defendants in the United States with the specificity required by Iqbal, absent discovery. The Supreme Court has stated, however, that plaintiffs must satisfy the pleading requirements of Rule 8 before the discovery stage, not after it. See Iqbal, 556 U.S. at 678-79, 129 S.Ct. 1937 (explaining that Rule 8 “does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions”).[7] We think it clear that no amendment to the complaint at this stage of the litigation-i.e., prior to discovery-could add “sufficient factual matter” related to domestic conduct to enable the complaint to survive a motion to dismiss, and we therefore decline to remand this case for amendment of the complaint.[8]
*594 In the absence of any adequate allegations of conduct in the United States, the only remaining nexus between Plaintiffs’ claims and this country is the fact that Defendants are both U.S. corporations. That fact, without more, is not enough to establish that the ATS claims here “touch and concern” the United States with sufficient force.
Admittedly, Kiobel (quite purposely) did not enumerate the specific kinds of connections to the United States that could establish that ATS claims “touch and concern” this country. See Kiobel, 133 S.Ct. at 1669 (Kennedy, J., concurring). It may well be, therefore, that a defendant’s U.S. citizenship or corporate status is one factor that, in conjunction with other factors, can establish a sufficient connection between an ATS claim and the territory of the United States to satisfy Kiobel,[9] But the Supreme Court has never suggested that a plaintiff can bring an action based solely on extraterritorial conduct merely because the defendant is a U.S. national. To the contrary, the Court has repeatedly applied the presumption against extraterritoriality to bar suits meeting that description. See, e.g., Morrison v. Nat’l Austl. Bank Ltd., 561 U.S. 247, 250-51, 269, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010) (holding that Section 10(b) did not reach claims of securities fraud against “foreign and American defendants” based on largely extraterritorial conduct (emphasis added)); Microsoft Corp. v. AT & T Corp., 550 U.S. 437, 455, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007) (holding that presumption against extraterritoriality barred patent infringement case brought against U.S. corporation but based on conduct abroad); EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 258-59, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (holding that Title VII did not apply to U.S. citizens employed by U.S. employers overseas). Nothing in Kiobel suggests that the Court would not adhere to this pattern in an ATS case. Cf. Balintulo, 727 F.3d at 190 (“[I]f all the relevant conduct occurred abroad, that is simply the end of the matter under Kiobel.”).[10]
Our reading of Kiobel is in accord with that of other federal courts. So far as we can ascertain, since Kiobel was decided, only one court has so much as suggested that an ATS claim is always viable when the defendant is a U.S. citizen or corporation. Every remaining federal court has dismissed ATS claims whose only connection to this country was the defendant’s U.S. citizenship.[11]
*595 By contrast, in all of the post-Kiobel cases in which courts have permitted ATS claims against U.S. defendants to go forward, the plaintiffs have alleged that at least some of the conduct relevant to their claims occurred in the United States. See Al Shimari, 758 F.3d at 530-31 (holding that ATS claims against U.S. corporation touched and concerned the United States, where conduct occurred pursuant to a contract made in the United States between defendant and the U.S. government, and managers in the United States approved the misconduct and attempted to cover it up); Krishanti v. Rajaratnam, 2014 WL 1669873, at *10 (D.N.J. Apr. 28, 2014) (holding that Kiobel did not bar plaintiffs’ ATS claims because they were based on “actions that occurred within the United States”); Sexual Minorities Uganda v. Lively, 960 F.Supp.2d 304, 321 (D.Mass.2013) (holding ATS claims against U.S. citizen were not barred where alleged torts occurred “to a substantial degree within the United States, over many years, with only infrequent actual visits to Uganda”); Mwani v. Bin Laden, 947 F.Supp.2d 1, 5 (D.D.C.2013) (holding that ATS claims touched and concerned the United States because plaintiffs had “presented evidence that ... overt acts in furtherance of [the defendants’] conspiracy took place in the United States”).
Plaintiffs point to a legal opinion written by Attorney General William Bradford in *596 1795 as evidence that “the ATS could reach U.S. nationals extraterritorially under the right circumstances.” In that Opinion, Attorney General Bradford addressed a 1794 incident in which several American citizens had joined in a French attack on the British colony of Sierra Leone, in violation of the United States’ official position of neutrality with respect to France and Britain. Bradford com-' mented that “there can be no doubt that the company or individuals who have been injured by these acts of hostility have a remedy by a civil suit in the courts of the United States,” pursuant to the ATS. Breach of Neutrality, 1 U.S. Op. Att’y Gen. 57 (1795).
The Bradford Opinion is too slender a reed, however, to support the broad assertion of ATS jurisdiction that Plaintiffs ask of us. The Supreme Court considered the Bradford Opinion in Kiobel and found that it “defies a definitive reading” and “hardly suffices to counter the weighty concerns underlying the presumption against extraterritoriality.” Kiobel, 133 S.Ct. at 1668. The Court went on to conclude that “[njothing about th[e] historical context” of the ATS, taken as a whole (including not only the events described in the Bradford Opinion but also other episodes contemporaneous with the passage of the ATS), “suggests that Congress ... intended federal common law under the ATS to provide a cause of action for conduct occurring in the territory of another sovereign.” Id. at 1668-69. Consequently, the Bradford Opinion cannot support Plaintiffs’ claim that a defendant’s corporate U.S. citizenship is a sufficient connection with the United States to establish ATS jurisdiction.[12]
We acknowledge that judges — including our dissenting colleague in this case — have eloquently argued that the United States has an obligation to provide redress for aliens injured whenever American citizens or corporations violate the law of nations. See, e.g., Cardona, 760 F.3d at 1193 (Martin, J., dissenting) (“The United States would fail to meet the expectations of the international community were we to allow U.S. citizens to travel to foreign shores and commit violations of the law of nations with impunity.”). But we agree with several of our sister circuits that this policy argument is unavailing, as “the determination of foreign policy goals and the means to achieve them is not for us.” Cardona, 760 F.3d at 1191 (majority opinion); see also Balintulo, 727 F.3d at 191-92. The federal courts cannot exercise jurisdiction under the ATS beyond the limits that Congress has prescribed, no matter how well-intentioned our motives for doing so.
To conclude, Plaintiffs’ ATS claims against Defendants are based solely on conduct that occurred in Colombia, and the only nexus with the United States that Plaintiffs allege is the fact that both Defendants are U.S. corporations. We hold that these ATS claims do not touch and concern the territory of the United States “with sufficient force to displace the presumption' against extraterritorial application,” Kiobel, 133 S.Ct. at 1669, and that they must be dismissed.
V. INTERNATIONAL COMITY
Finally, we dismiss Plaintiffs’ state-law claims based on the doctrine of interná- *597 tional comity. We do not reach any other putative bases — whether constitutional or prudential — for dismissing these claims.[13] Cf. Bi v. Union Carbide Chems. & Plastics Co., 984 F.2d 582, 584 (2d Cir.1993).
The federal common law doctrine of international comity is applicable to these state law claims notwithstanding the general rule that federal courts apply California’s substantive law when sitting in diversity. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The Supreme Court has made an exception to the Erie doctrine “when there are uniquely federal interests at stake,” such as “litigation that implicates the nation’s foreign relations.” Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227, 1232 (11th Cir.2004). For instance, “an issue concerned with a basic choice regarding the competence and function of the Judiciary and the National Executive in ordering our relationships with other members of the international community must be treated exclusively as an aspect of federal law.” Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 425, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (holding that the federal common law act of state doctrine precluded a federal court from considering a state law challenge to the Cuban government’s expropriation of certain property). In a similar vein, the federal foreign affairs doctrine requires federal courts to dismiss state law claims based on their potential to interfere with U.S. foreign relations. See Am. Ins. Ass’n v. Garamendi, 539 U.S. 396, 401, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003); Zschernig, 389 U.S. at 440-41, 88 S.Ct. 664. For the same reason, we must consider the applicability of the international comity doctrine to these state law claims.
International comity “ ‘is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.’ ” In re Simon, 153 F.3d 991, 998 (9th Cir.1998) (quoting Hilton v. Guyot, 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895)); see also Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for the S. Dist. of Iowa, 482 U.S. 522, 543 n. 27, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987) (“Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states.”); Black’s Law Dictionary 324 (10th ed.2014) (defining “comity” as “[a] practice among politi *598 cal entities (as countries, states, or courts of different jurisdictions), involving especially] mutual recognition of legislative, executive, and judicial acts”).
Comity is not a rule expressly derived from international law, the Constitution, federal statutes, or equity, but it draws upon various doctrines and principles that, in turn, draw upon all of those sources. It thus shares certain considerations with international principles of sovereignty and territoriality; constitutional doctrines such as the political question doctrine; principles enacted into positive law such as the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1830, 1602, 1611 (2006); and judicial doctrines such as forum non con-veniens and prudential exhaustion.[14] Comity is a “rule of ‘practice, convenience, and expediency’ rather than of law” that courts have embraced “to promote cooperation and reciprocity with foreign lands.” Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru, 109 F.3d 850, 854 (2d Cir.1997) (quoting Somportex Ltd. v. Phila. Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir.1971)).
International comity is a doctrine of prudential abstention, one that “counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law.” United States v. Nippon Paper Indus. Co., 109 F.3d 1, 8 (1st Cir.1997). “The doctrine has never been well-defined,” but comity “is clearly concerned with maintaining amicable working relationships between nations, a ‘shorthand for good neighbourliness, common courtesy and mutual respect between those who labour in adjoining judicial vineyards.’ ” JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C. V., 412 F.3d 418, 423 (2d Cir.2005) (quoting British Airways Bd. v. Laker Airways Ltd., [1984] E.C.C. 36, 41 (Eng.C.A.)).[15]
There are essentially .“two distinct doctrines [which] are often conflated under the heading ‘international comity.’” In re S. African Apartheid Litig., 617 F.Supp.2d 228, 283 (S.D.N.Y.2009). The first is legislative or “prescriptive comity,” which guides domestic courts as they decide the extraterritorial reach .of federal statutes. See Kiobel, 133 S.Ct. at 1664; F. Hoffmann-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 165, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004); see also Hartford Fire Ins. Co. v. California, 509 U.S. 764, 817, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (Scalia, J., dissenting) (describing prescriptive comity as “the respect sovereign nations afford each other by limiting the reach of their laws”); In re Maxwell *599 Commc’n Corp. plc by Homan, 93 F.3d 1036, 1047 (2d Cir.1996) (describing prescriptive comity as a “canon of [statutory] construction [that] might shorten the reach of a [domestic] statute”).
The second strain of the doctrine is referred to as “comity among courts” or adjudicatory comity, which “may be viewed as a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state.” Maxwell, 93 F.3d at 1047; see also Hartford Fire, 509 U.S. at 817, 113 S.Ct. 2891 (Scalia, J., dissenting) (describing “comity of the courts” as a set of principles “whereby judges decline to exercise jurisdiction over matters more appropriately adjudged elsewhere”).[16] Thus, adjudicatory comity “involves ... the discretion of a national court to decline to exercise jurisdiction over a case before it when that case is pending in a foreign court with proper jurisdiction.” JP Morgan Chase Bank, 412 F.3d at 424. In such a case, “deference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and ... do not contravene the laws or public policy of the United States.” Id.
A. Standards for Applying Comity
1. Whether Adjudicatory Comity Requires a “True Conflict”
The Supreme Court’s most recent most discussion of international comity was in Hartford Fire, 509 U.S. at 798, 113 S.Ct. 2891. Hartford Fire did not explain, however, what factors we should or must consider when addressing comity; in particular, it left unclear whether a “true conflict” is a predicate to prudential abstention on the grounds of comity. The district court in the instant litigation held that, “at least in the Ninth Circuit, the application of international comity is generally limited to cases where there is a ‘true conflict’ between domestic and foreign law.” Mujica I, 381 F.Supp.2d at 1155-56 (citing Hartford Fire, 509 U.S. at 794-95, 113 S.Ct. 2891, and In re Simon, 153 F.3d at 999). And Plaintiffs argue here that “[t]he existence of a ‘true conflict’ is a threshold requirement for abstention on international comity grounds,” and that “[i]n this Court, ... [the] rule is absolutely clear that application of the law of international comity is limited to cases in which there is in fact a true conflict between domestic and foreign law.”
We do not think that Hartford Fire stands for the proposition adopted by the district court and urged by Plaintiffs. Hartford Fire involved the reach of U.S. antitrust laws, which applied extraterrito-rially; in that case, the question was whether a U.S. district court could exercise jurisdiction over antitrust claims filed against a group of London reinsurers. 509 U.S. at 769, 798-99, 113 S.Ct. 2891. The London reinsurers argued that, based on international comity, the antitrust laws should not be read to extend to their activities, which were regulated by British law. See id. at 797-98, 113 S.Ct. 2891.
The Supreme Court stated that the “only substantial question in th[e] litigation” was “whether there [wa]s in fact a true conflict between domestic and foreign law.” Id. at 798, 113 S.Ct. 2891 (internal quotation marks omitted). The defendants argued that applying federal antitrust laws *600 would conflict with British law because Britain had established its own comprehensive regulatory regime for antitrust issues and the defendants’ conduct was consistent with British law. Id. at 798-99, 113 S.Ct. 2891. But the Court held that this situation did not qualify as a “true conflict,” explaining that “[n]o conflict exists, for these purposes, where a person subject to regulation by two states can comply with the laws of both.” Id. at 799, 113 S.Ct. 2891. (internal quotation marks and citation omitted). And “[sjince the London reinsurers d[id] not argue that British law requirefd] them to act in some fashion prohibited by the law of the United States, or claim that their compliance with the laws of both countries [wa]s otherwise impossible, [the Court saw] no conflict with British law.” Id. (internal quotation marks omitted).
In light of the lack of conflict, the Court held that there was “no need ... to address other considerations that might inform a decision to refrain from the exercise of jurisdiction on grounds of international comity.” Id. Justice Scalia dissented from that part of the opinion and pointed out that “prescriptive comity” or “the practice of using international law to limit the extraterritorial reach of statutes” was “firmly established.” Id. at 817-18 (Scalia, J., dissenting).
Since the majority did not address the “other considerations” bearing on comity, the Court’s Hartford Fire analysis “left unclear whether it was saying that the only relevant comity factor in that case was conflict with foreign law ... or whether the Court was more broadly rejecting balancing of comity interests in any case where there is no true conflict.” Harold Hongju Koh, Transnational Litigation in United States Courts 80 (2008). We think that Hartford Fire does not require proof of a “true conflict” as a prerequisite for invoking the doctrine of comity, at least in a case involving adjudicatory comity. See id. (concluding that since such a reading of the case “would be a much more dramatic result for the Court to have reached sub silentio, I am inclined to doubt that it meant to rule so broadly”).
Since Hartford Fire, the circuits have refined the Court’s “true conflict” analysis and have generally required proof of such a conflict only in cases where prescriptive comity is at issue — that is, where a party claims that it is subject to conflicting regulatory schemes, such as antitrust laws or bankruptcy rules that apply extraterritorially.[17] As the Southern District of New York has observed, “[i]n post-Hartford Fire cases, conflict analysis has not been rigidly invoked to preclude consideration of the full range of principles relating to international comity. Rather, conflict analysis is most often applied when comity principles intersect with issues of statutory construction.” Freund v. Republic of Fr., 592 F.Supp.2d 540, 574 (S.D.N.Y.2008) (citation omitted), aff'd sub nom., Freund v. Societe Nationale des Chemins de fer Francais, 391 Fed.Appx. 939 (2d Cir.2010) (unpublished); see also, e.g., Maxwell, 93 F.3d at 1049 (requiring a “true conflict” in a bankruptcy case).
By contrast,, the courts have not required proof of a true conflict — although they have considered such a conflict relevant — when considering adjudicatory comity. Instead, the courts have considered a range of factors when deciding whether to abstain from exercising jurisdiction due to *601 a past or potential judicial proceeding elsewhere. See, e.g., Ungaro-Benages, 379 F.3d at 1238 (determining that a true conflict was not required and examining “the strength of our government’s interests in using the Foundation [established to hear claims from victims of the Nazis], the strength of the German government’s interests, and the adequacy of the Foundation as an alternative forum”); Bigio v. Coca-Cola Co., 448 F.3d 176, 178 (2d Cir.2006) (“[T]he only issue of international comity properly raised here is whether adjudication of this case by a United States court would offend ‘amicable working relationships’ with Egypt.” (citations omitted)); JP Morgan Chase Bank, 412 F.3d at 424 (deference to foreign adjudicatory proceedings “is appropriate so long as the foreign proceedings are procedurally fair and ... do not contravene the laws or public policy of the United States”); Int’l Nutrition Co. v. Horphag Research Ltd., 257 F.3d 1324, 1329 (Fed.Cir.2001) (“As a general rule, comity may be granted where it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated.” (quotation marks and internal citation omitted)); Freund, 592 F.Supp.2d at 574 (“[T]he existence of a true conflict does not bar the Court from applying the doctrine and considering other legitimate concerns implicated by United States courts exercising jurisdiction over a foreign sovereign.”). But see S. African Apartheid Litig., 617 F.Supp.2d at 283 (holding true conflict analysis required in ATS suit against corporations that conducted business in apartheid South Africa).
Our own decision in In re Simon — a prescriptive comity case — is consistent with this pattern. There, we considered whether a bankruptcy court could sanction a foreign creditor for pursuing collection of a foreign debt that had been discharged in bankruptcy. 153 F.3d at 994. Although the creditor (HSBC) was based in Hong Kong, it had participated in the bankruptcy proceeding in the United States. Id. We began our analysis with a discussion of the extraterritorial application of U.S. law. Id. at 995. We concluded that “Congress intended extraterritorial application of the Bankruptcy Code as it applies to property of the estate.” Id. at 996.
We then turned to whether we were “require[d]” by comity to vacate the bankruptcy court’s injunction. Id. at 997. We noted that “[international comity in transnational insolvency proceedings must be considered in the context of bankruptcy theory.” Id. at 998. We then explained that the Bankruptcy Code “provides for a flexible approach to international insolvencies” in which there is general “deference to the country where the primary insolvency proceeding is located.” Id. The “sole, plenary insolvency proceeding” involving the debtor had been in the United States. Id. at 999. Because there were no “competing bankruptcy proceedings,”[18] and because HSBC (which was seeking to apply comity to avoid sanctions from the U.S. bankruptcy court) had participated in the U.S. bankruptcy proceeding and had enjoyed its benefits, we held that, under the *602 circumstances, international comity did “not dictate a result contrary to that reached by the district and bankruptcy courts. Rather, it [wa]s consistent with the general principles of international comity which is limited to cases in which ‘there is in fact a true conflict between domestic and foreign law.’ ” Id. (quoting Hartford Fire, 509 U.S. at 798, 113 S.Ct. 2891 (quotation marks and citation omitted)).
Simply put, we do not interpret In re Simon — which referenced the concept of a “true conflict” in passing and in the specialized context of a bankruptcy statute that applied extraterritorially — to require proof of “true conflict” as an irreducible minimum for abstention in all comity cases.
Our other post-Hartford Fire cases also suggest that proof of “true conflict” is not a prerequisite to comity. In those cases we took account of whether there was a conflict between American and foreign law. Even when we did not find a conflict, we did not end our inquiry but moved on to consider other factors. For example, in Metro Industries, Inc. v. Sammi Corp., 82 F.3d 839, 846-47 (9th Cir.1996), we found no conflict between American and Korean law, but considered other factors to determine the reach of the Sherman Act. We looked to seven factors we had previously set out in Timberlane Lumber Co. v. Bank of America, 549 F.2d 597, 614 (9th Cir.1976) (“Timberlane I ”), for what we called “a jurisdictional rule of reason.” Id. at 613. One of the Timberlane I factors was a conflict between foreign and domestic law. We noted that Hartford Fire overruled our holding in Timberlane Lumber Co. v. Bank of Am., 749 F.2d 1378 (9th Cir.1984) (“Timberlane II”), as to what “would amount to conflict of law,” but determined that Hartford Fire “did not question the propriety of the jurisdictional rule of reason or the seven comity factors set forth in Timberlane I.” Metro Indus., 82 F.3d at 846 n. 5.
Similarly, in In re Grand Jury Proceedings, 40 F.3d 959, 964-65 (9th Cir.1994), we presumed that there was a difference between a grand jury witness’s rights under American law and his rights under Austrian law regarding the privacy of his Austrian bank accounts. That conflict, however was not the “true conflict” described by the Court in Hartford Fire. The laws of Austria and the United States did not require the witness to commit inconsistent acts; rather, he had greater privacy rights under Austrian law than American law, but it would not violate Austrian law for him to waive those rights in response to an order from a U.S. court. Id. at 966. Thus, the witness could “comply with the laws of both.” Hartford Fire, 509 U.S. at 799, 113 S.Ct. 2891 (quotation marks and citation omitted). Had we believed that proof of a “true conflict” was required, that fact would have ended our inquiry. It did not. Instead, we decided that “[i]n considering international comity, we balance the competing interests of Austria and the United States ... to determine whether the purported illegality of the order under Austrian law precludes its enforcement.” In re Grand Jury Proceedings, 40 F.3d at 965.
As our decisions in In re Simon, Metro Industries, and In re Grand Jury Proceedings demonstrate, we have not read Hartford Fire as imposing a rigid new set of requirements for finding comity. At least in cases considering adjudicatory comity, we will consider whether there is a conflict between American and foreign law as one factor in, rather than a prerequisite to, the application of comity.
Accordingly, the district court erred when it required the existence of a true conflict when it analyzed the application of international comity. And, since *603 the district court did not identify the correct legal rule, “we must conclude it abused its discretion.” Hinkson, 585 F.3d at 1262; see also, e.g., Perry v. Brown, 667 F.3d 1078, 1084 (9th Cir.2012).
Having determined that a true conflict is not always required for the application of adjudicatory comity and that the district court abused its discretion in concluding otherwise, we proceed to consider the proper framework for analyzing comity.
2. Factors Bearing on Adjudicatory Comity
Beyond the question of true conflict, courts have struggled to apply a consistent set of factors in their comity analyses. As one commentator has observed, because there is “no clear analytical framework for its exercise, ... courts have been left to cobble together their own approach to [international comity].” Childress III, supra, at 51. The district court in this case followed a three-part framework articulated by the Eleventh Circuit in Ungaro-Benages for the prospective application of international comity. See Mujica I, 381 F.Supp.2d at 1160 (citing Ungaro-Benages, 379 F.3d at 1238).[19] Under Ungaro-Benages’ approach, a court “evaluated] several factors, including [1] the strength of the United States’ interest in using a foreign forum, [2] the strength of the foreign governments’ interests, and [3] the adequacy of the alternative forum.” Ungaro-Benages, 379 F.3d at 1238 (citations omitted).
The Ungaro-Benages framework is a useful starting point for analyzing comity claims, but the case offers no substantive standards for assessing its three factors. Ungaro-Benages tells us to consider the respective interests of the United States and the foreign country, but it does not tell us what interests count or what makes a foreign forum adequate or inadequate. See id. at 1238-39. For those considerations, we may draw on our oft-cited opinion in Timberlane I. We note that the criteria we considered in that antitrust case[20] — which also influenced § 403, “Limitations on Jurisdiction to Prescribe” of the Restatement (Third) of Foreign Relations Law,[21] see Koh, supra, at 66 — are better *604 adapted to the commercial context. Nevertheless, these factors help provide us with a general list of indicia to which we may look when weighing U.S. and foreign interests and the adequacy of the alternative forum.
a. U.S. interests
The (nonexclusive) factors we should consider when assessing U.S. interests include (1) the location of the conduct in question, (2) the nationality of the parties, (3) the character of the conduct in question, (4) the foreign policy interests of the United States, and (5) any public policy interests. When some or all of a plaintiffs claims arise under state law, the state’s interests, if any, should be considered as well. The doctrine of comity is particularly concerned with “sovereign interests,” Childress III, supra, at 61-62, and the sovereign whose interests are relevant when a federal court is hearing state-law claims is as much the individual state— whose law the federal court must faithfully apply — as the United States.[22] Cf. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). See generally Restatement (Third) of Foreign Relations Law § 403(2)(c) (courts considering whether jurisdiction is reasonable should assess “the importance of regulation to the regulating state ” (emphasis added)). We caution, however, that in cases of this kind there is always a risk that “our foreign relations could be impaired by the application of state laws, which do not necessarily reflect national interests.” Ungaro-Benages, 379 F.3d at 1232-33. Out of regard for that risk, we should be careful not to give undue weight to states’ prerogatives.
We will discuss each of the foregoing factors in turn.
First, comity is most closely tied to the question of territoriality. We *605 should consider where the conduct in question took place. This is a critical question in determining the extraterritorial reach of U.S. statutes, see Kiobel, 133 S.Ct. at 1663-65; Arabian Am. Oil, 499 U.S. at 248, 111 S.Ct. 1227, and it is a relevant consideration in adjudicatory comity as well. The general presumption against extraterritorial application of U.S. law recognizes that “United States law governs domestically but does not rule the world.” Microsoft, 550 U.S. at 454, 127 S.Ct. 1746. Comity similarly rests on respect for the legal systems of members of the international legal community — a kind of international federalism — and thus “serves to protect against unintended clashes between our laws and those of other nations which could result in international discord.” Arabian Am. Oil, 499 U.S. at 248, 111 S.Ct. 1227.
Not surprisingly, U.S. courts have afforded far less weight, for comity purposes, to U.S. or state interests when the activity at issue occurred abroad. See Torres v. S. Peru Copper Corp., 965 F.Supp. 899, 909 (S.D.Tex.1996) (dismissing action under comity where the “activity and the alleged harm occurred entirely in Peru [and] Plaintiffs are all residents of Peru”), aff'd, 113 F.3d 540 (5th Cir.1997); Sequihua v. Texaco, Inc., 847 F.Supp. 61, 63 (S.D.Tex.1994) (declining jurisdiction under comity where challenged activity occurred entirely in Ecuador); see also Chowdhury v. Worldtel Bangl. Holding, Ltd., 746 F.3d 42, 49 (2d Cir.2014) (reversing lower court and foreclosing jurisdiction over ATS claims filed by Bangladeshi plaintiff allegedly detained and tortured by Bangladeshi authorities in Bangladesh). See generally Koh, supra, at 18-19, 51-57 (describing courts’ aversion to adjudicating extraterritorially as rooted in principle of national sovereignty).
Second, we should take account of whether any of the parties are United States citizens or nationals, and also whether they are citizens of the relevant state. See Jota v. Texaco, Inc., 157 F.3d 153, 155 (2d Cir.1998) (vacating dismissal, on forum non conveniens, comity, and failure to join indispensable party grounds, of action by Ecuadorians against American oil company for injuries that allegedly resulted from action in Ecuador); Reebok Int’l, Ltd. v. Mamatech Enters., Inc., 970 F.2d 552, 556-57 (9th Cir.1992) (holding that U.S. courts have jurisdiction where some parties were U.S. corporations and U.S. persons and other non-nationals had substantial contacts with the United States). As we previously discussed in the context of the ATS, even if the presence of U.S. nationals as defendants does not establish jurisdiction in this country on its own, it can, as we have noted, contribute to a finding that there is a “nexus” between the United States and the parties and claims in a case. See supra; see also, e.g., Sarei v. Rio Tinto PLC (“Sarei III”), 650 F.Supp.2d 1004, 1016 (C.D.Cal.2009), aff'd in part, rev’d in part and remanded, 671 F.3d 736 (9th Cir.2011), cert. granted, judgment vacated sub nom. Rio Tinto PLC v. Sarei — U.S. -, 133 S.Ct. 1995, 185 L.Ed.2d 863 (2013) and aff'd, 722 F.3d 1109 (9th Cir.2013).
Kiobel and the lower-court decisions that have followed in its wake confirm the importance of these first two factors to courts’ jurisdictional analyses in cases involving international events. While Kiobel and its progeny specifically address the interpretation of a statute — the ATS — and not the prudential international comity doctrine, the guiding principle of those cases applies equally in the context of adjudicatory comity: the weaker the nexus between the challenged conduct and U.S. territory or U.S. parties, the weaker the justification for adjudicating the matter in *606 U.S. courts and applying U.S. federal or state law.
The third factor we should consider bearing on U.S. interests is the nature of the conduct in question. We should ask whether the action is civil or criminal; whether it sounds in tort, contract, or property; and whether the conduct is a regulatory violation or is a violation of international norms against torture, war crimes, or slavery. See Sosa v. Alvarez-Machain, 542 U.S. 692, 731-33, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004); Filartiga v. Penar-Irala, 630 F.2d 876, 890 (2d Cir.1980). These inquiries may inform our judgment of the importance of the issue to the United States or to an individual state. The closer the connection between the conduct and core prerogatives of the sovereign, the stronger that sovereign’s interest. For example, in Timberlane I, which was an antitrust case, we considered “the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, ... and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.” Timberlane I, 549 F.2d at 614.
Fourth, we must take cognizance of the foreign policy interests of the United States. As we do when applying the political question, act of state, and foreign affairs doctrines, we must respect the Constitution’s commitment of the foreign affairs authority to the political branches. U.S. Const, art. I, § 8, cl. 3 (“The Congress shall have Power ... To regulate Commerce with foreign Nations”); art. II, § 2 (“[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties ... and he ... shall appoint Ambassadors, other public Ministers and Consuls); art. II, § 3 (“[The President] shall receive Ambassadors and other public Ministers”). See Garamendi 539 U.S. at 413-15, 123 S.Ct. 2374; Japan Line, Ltd. v. Cnty. of Los Angeles, 441 U.S. 434, 449, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979); Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 427, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); Baker, 369 U.S. at 211, 82 S.Ct. 691.
Courts have found that U.S. interests weigh against hearing cases where doing so would be harmful to U.S. foreign policy. See Hwang Geum Joo v. Japan, 413 F.3d 45, 52 (D.C.Cir.2005) (dismissing as non-justiciable ATS claims brought by Korean women in light of U.S. government’s argument that “adjudication by a domestic court not only would undo a settled foreign policy of state-to-state negotiation with Japan, but also could disrupt Japan’s delicate relations with China and Korea, thereby creating serious implications for stability in the-region” (internal quotation marks omitted)); Ungaro-Benages, 379 F.3d at 1239 (abstaining in light of strong foreign policy interest in promoting settlement of Nazi-era claims through government-backed forum); O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A., 830 F.2d 449, 451 (2d Cir.1987) (affirming dismissal where district court concluded that U.S.-Colombian relations would likely suffer if U.S. litigation proceeded in light of foreign state’s “strong interest” in relevant protectionist legislation and ownership interest in defendant). This deference is rooted, in part, in separation of power concerns. See Christopher v. Harbury, 536 U.S. 403, 417, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (dismissing claim by Guatemalan widow alleging federal officers concealed information about her husband’s fate and holding that “if there is to be judicial enquiry, it will raise concerns for the separation of powers in trenching on matters committed to the other branches”).
*607 Fifth, we may also weigh U.S. public policy interests, and those of the relevant state to a lesser extent, for “courts will not extend comity to foreign proceedings when doing so would be contrary to the policies ... of the United States.” Pravin, 109 F.3d at 854. For example, we have held that there is a strong U.S. interest justifying U.S. jurisdiction in “preventing trademark violations,” Reebok Int’l, 970 F.2d at 556, and we have spoken of the strong U.S. policy favoring enforcement of arbitration and forum selection clauses. See Dependable Highway Exp. v. Navigators Ins. Co., 498 F.3d 1059, 1068-69 (9th Cir.2007). The Second Circuit has also refused to extend international comity to a foreign state’s debt negotiations as contrary to American policy because the United States “encourages participation in, and advocates success of’ such debt resolution procedures, and the United States “has a strong interest in ensuring the enforceability of valid debts ... owed to United States lenders.” Pravin, 109 F.3d at 855.
We have treated differences in legal approach cautiously, however. Even when foreign practices may differ from American ones, we will respect those differences so long as the variance does not violate strongly-held state or federal public policy. See Belize Telecom, Ltd. v. Gov’t of Belize, 528 F.3d 1298, 1307 (11th Cir.2008) (holding that decision allowing Government of Belize to remove directors of telecom company did not “violate[] American public policy” where decision “merely g[ave] effect to the plain language” of corporate articles of incorporation, which were interpreted under Belizean law).
b. Foreign interests
The proper analysis of foreign interests essentially mirrors the consideration of U.S. interests. Foreign states, no less than the United States, have legitimate interests in regulating conduct that occurs within their borders, involves their nationals, impacts their public and foreign policies, and implicates universal norms. See Mich. Cmty. Servs., Inc. v. NLRB, 309 F.3d 348, 356 (6th Cir.2002).
Accordingly, courts have considered the territoriality of the questioned activity, its effects, the nationality of the parties, and the interests of the foreign state when deciding whether to exercise jurisdiction. See Jota, 157 F.3d at 160 (holding that deference to foreign state’s position on matters that took place within its territory is “inherent in the concept of comity”); see also Sequihua, 847 F.Supp. at 62 (declining jurisdiction in part because of Ecuador’s “official ]” protest that the litigation “will do ‘violence’ to the international legal system”).
To illustrate, in Bi, the Second Circuit held that individual victims of the Bhopal gas leak disaster in India, which harmed almost exclusively Indians, did not have standing to challenge a settlement reached between India and the company responsible for the tort in light of an Indian law granting the Indian government exclusive standing to represent victims of the disaster. 984 F.2d at 586 (declining “to pass judgment on the validity of India’s response to a disaster that occurred within its borders” because doing so “would disrupt our relations with that country and frustrate the efforts of the international community to develop methods to deal with problems of this magnitude in the future”); see also, e.g., Freund, 592 F.Supp.2d at 578 (declining jurisdiction where “Plaintiffs’ claims [we]re inextricably connected to France”).
c. The adequacy of the forum
The interests of the United States and the foreign government must be evaluated in light of the adequacy of the foreign *608 forum. When it comes to the adequacy of the forum, courts consider decisions rendered by the alternative forum and ask “ ‘(1) whether the judgment was rendered via fraud; (2) whether the judgment was rendered by a competent court utilizing proceedings consistent with civilized jurisprudence; and (3) whether the foreign judgment is prejudicial [and] ... repugnant to fundamental principles of what is decent and just.’ ” Belize Telecom, 528 F.3d at 1306 (quoting Turner Entm’t Co. v. Degeto Film GmbH, 25 F.3d 1512, 1519 (11th Cir.1994)). Typically, courts ask whether one side has presented specific evidence that the judgment of the alternative forum was significantly inadequate. See id. (“In this case, neither party has argued that the Belizean judgments were rendered via fraud or that the Belizean proceedings lacked any element of civilized jurisprudence.”).
The Second Circuit, for example, has held that deference to the judgment of a “foreign court is appropriate so long as the foreign proceedings are procedurally fair and ... do not contravene the laws or public policy of the United States.” JP Morgan Chase Bank, 412 F.3d at 424. In that case, the court deferred to the jurisdiction of the Mexican courts even though there was a six-year delay in resolving the litigation, since such a delay did not result in “manifest injustice” or violate “fundamental standards of procedural fairness.” Id. at 428 (internal quotation marks omitted); see also Jota, 157 F.3d at 160 (“When a court dismisses on the ground of comity, it should normally consider whether an adequate forum exists in the objecting nation and whether the defendant sought to be sued in the United States forum is subject to or has consented to the assertion of jurisdiction ... in the foreign forum.”); U.S. ex rel. Saroop v. Garcia, 109 F.3d 165, 170 (3d Cir.1997) (invoking comity to defer to foreign court on validity of extradition treaty absent assertion that foreign state failed to follow regular judicial proceedings, engaged in prejudicial or fraudulent practices, or refused to extend deference to United States’ judicial findings).[23]
We are justly proud of our legal system. But we recognize that there are other legal systems that have effected, in different ways, our constitutional values of separation of powers, due process of law, and the equal protection of the law. Comity, as the “golden rule among nations,” compels us to “give the respect to the laws, policies and interests of others that [we] would have others give to [our] own in the same or similar circumstances.” Mich. Cmty. Servs., Inc., 309 F.3d at 356 (internal quotation marks omitted).
Accordingly, we proceed under the Un-garo-Benages framework as we have elaborated it from the case law, mindful that comity is circumstance-dependent and not susceptible to mechanical application. “Since comity varies according to the factual circumstances surrounding each claim for its recognition, the absolute boundaries of the duties it imposes are inherently uncertain.” Laker Airways, 731 F.2d at 937.
*609 B. Analysis
. 1. U.S. Interests
At first blush, the United States’s interests in this case appear to be mixed. On the one hand, as we have explained, the conduct complained of — Occidental and AirScan’s alleged cooperation with the CAF in the bombing at Santo Domingo— took place entirely in Colombia. Plaintiffs have not adequately pled any factual matter suggesting that any planning or operations took place in the United States. All the Plaintiffs, moreover, are or were Colombian citizens and residents at the time of the bombings. Cf. Balintulo, 727 F.3d at 189. On the other hand, the United States has an interest in upholding international human rights norms, and Plaintiffs allege that Defendants’ actions violated international norms in several respects. See Sarei III, 650 F.Supp.2d at 1020-21. Occidental and AirSean, moreover, are U.S. chartered corporations, with Occidental a citizen of California, and the United States has manifested some level of interest in the good behavior of its corporate citizens abroad, see, e.g., Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-l, although the United States does not monitor or regulate all the behavior of its citizens, natural or corporate, overseas. See Microsoft Corp., 550 U.S. at 454, 127 S.Ct. 1746; Morrison v. National Australia Bank Ltd., 547 F.Sd 167, 174 (2d Cir.2008).
The United States, however, has spoken directly on the question of its interests in this case. The district court particularly credited the State Department’s Supplemental SOI and concluded it was “strong evidence that the United States, in the interest of preserving its diplomatic relationship with Colombia, prefers that the instant case be handled exclusively by the Colombian justice system.” Mujica I, 381 F.Supp.2d at 1161. The SOI, dated December 23, 2004, articulated several reasons why “the State Department believes that the adjudication of this case will have an adverse impact on the foreign policy interests of the United States.” First, it referenced the related actions which were then ongoing in Colombia against the Colombian government and military personnel regarding the incident. It noted that the American companies that are the subject of the instant suit were not then subject to the suits in the Colombian courts, but it added that Occidental had stipulated to service and consented to jurisdiction in Colombia.
Second, the State Department wrote that it “believe[d] that foreign courts generally should resolve disputes arising in foreign countries, where such courts reasonably have jurisdiction and are capable of resolving them fairly. An important part of our foreign policy is to encourage other countries to establish responsible legal mechanisms for addressing and resolving alleged human rights abuses.” It warned that the instant case could give the impression that the U.S. government “does not recognize the legitimacy of Colombian judicial institutions” and that those “perceptions could potentially have negative consequences for our bilateral relationship with the Colombian government.” The State Department praised Colombia as one of the United States’ “closest allies in this hemisphere,” and it warned that lawsuits like this one “have the potential for deterring present and future U.S. investment in' Colombia.” Finally, the letter explained that “reduced U.S. investment in Colombia’s oil industry” might, in turn, “detract from the vital U.S. policy goal of expanding and diversifying our sources of imported oil.”
.The United States reiterated these interests in its amicus brief during the initial appeal. It wrote that “the particular foreign policy interests identified by the Unit *610 ed States’ Supplemental Statement of Interest warrant dismissal of the litigation under the doctrine of international comity.” The amicus brief went on to argue that the “district court properly recognized the ‘substantial interest’ of the United States and the ‘strong interest’ of our regional ally, Colombia, in having the lawfulness of military action reportedly taken by Colombian military officials in the course of fighting insurgents in that country adjudicated exclusively in Colombian courts.” It also noted the favorable judgment the victims of the attack received from the Colombian government that was then on appeal and has now been affirmed. There is nothing to suggest that the State Department has since changed its views.
The Supreme Court has said that “should the State Department choose to express its opinion on the implications of exercising jurisdiction over particular petitioners in connection with their alleged conduct, that opinion might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy.” Republic of Austria v. Altmann, 541 U.S. 677, 702, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004); see Whiteman v. Dorotheum GmbH & Co. KG, 431 F.3d 57, 74 (2d Cir.2005) (crediting U.S. government’s expression of interests when dismissing as nonjusticiable under the political question doctrine claims brought against Austria).
That guidance is particularly apt here. This is not a ease in which the State Department has issued no SOI or an equivocal SOI and the United States’ position might be less entitled to deference. See, e.g., Gross, 456 F.3d at 389-90 (declining to defer to U.S. government’s preference where “the United States Executive has taken no position on the merits of this dispute, and has not promised dismissal or intervention.”). Here, the State Department asked for the case to be dismissed, first by strong implication in the SOI, and then explicitly in its amicus brief, which urged the affirmance of the district court’s judgment of dismissal. Accordingly, we “give serious weight to the Executive Branch’s view of [this] case’s impact on foreign policy,” Sosa, 542 U.S. at 733 n. 21, 124 S.Ct. 2739, and we conclude that the United States’ interest in having the case adjudicated exclusively in Colombia is strong.
California’s interest in this case weighs somewhat more in favor of our adjudicating Plaintiffs’ claims than does the United States’ national interest. We have previously acknowledged, for example, that California has a “significant interest in providing a forum for those harmed by the actions of its corporate citizens.” Carijano, 643 F.3d at 1232. But this interest is a general interest in good corporate behavior [24] and should not be overstated, given that Plaintiffs are not California citizens, that their claims concern events that occurred abroad, and that one Defendant (AirScan) is not a California resident corporation. See Saleh v. Titan Corp., 580 F.3d 1, 12 (D.C.Cir.2009) (commenting, in state-law tort case brought against by foreign plaintiffs and arising out of events in foreign country, that “the interests of any *611 U.S. state ... are de minimis in this dispute”). In any event, California’s interest in having this case adjudicated here scarcely outweighs the United States’ unambiguous preference to the contrary. As the Supreme Court has stated, “[t]here is ... no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government’s policy.” Garamendi, 539 U.S. at 413-14, 123 S.Ct. 2374. In light of' the forcefully expressed views of the State Department, we conclude that that point has clearly been reached in this case.
2. Colombian Interests
We next consider the strength of Colombia’s interest in litigating the matter. See Ungaro-Benages, 379 F.3d at 1238. As in Bi, the activity here occurred exclusively within the territory of a foreign state and involved solely foreign victims. 984 F.2d at 586. Although Defendants are U.S. corporations, the district court correctly concluded that “Colombia has a strong interest in preventing this Court’s jurisdiction over the instant case.” Mujica I, 381 F.Supp.2d at 1162. The court came to that conclusion after considering one of the two démarches from the Colombian Minis- • try of Foreign Affairs that were attached to the SOI. Id. Both démarches referenced, by case number, the instant matter’s district court litigation. The first démarche, dated February 25, 2004, informed the U.S. Embassy in Bogota that “the Colombian judiciary in accordance with the principle of territoriality” was investigating the Santo Domingo bombing and assessing “the responsibility of agents of the Colombian Government” who were involved in it. The second démarche, dated March 12, 2004, stated simply: “The Ministry of Foreign Affairs wishes to add that the Government of Colombia is of the opinion that any decision in this case may affect the relations between Colombia and the US.” While the second démarche did not explain why Colombia holds this position, the SOI surmised that Colombia had a strong interest in avoiding duplicative litigation that “may be seen as unwarranted and intrusive” or would show disrespect for the “legitimacy of Colombian judicial institutions.” In any event, as the district court observed, the Colombian government does not have “to explain itself to a federal court.” Mujica I, 381 F.Supp.2d at 1162.
Although Colombia’s position is not detailed, “inherent in the concept of comity is the desirability of having the courts of one nation accord deference to the official position of a foreign state, at least when the position is expressed on matters concerning actions of the foreign state taken within or with respect to its own territory.” Jota, 157 F.3d at 160. Here, Colombia has done exactly that — it has taken a specific position on an incident that occurred within its territory involving its nationals. See also Freund, 592 F.Supp.2d at 578 (crediting the official position of both the United States and France that France should be the “exclusive” forum for addressing plaintiffs claims where the underlying act occurred in France).
This situation thus stands in clear contrast to other cases where a foreign state did not express an interest in having its courts serve as a forum for relevant litigation. See Abad v. Bayer Corp., 563 F.3d 663, 668 (7th Cir.2009) (“[N]either [Argentina nor the United States] appears to have any interest in having the litigation tried in its courts rather than in the courts of the other country; certainly no one in the government of either country has expressed to us a desire to have these lawsuits litigated in its courts.”); Pacheco de Perez v. AT & T Co., 139 F.3d 1368, 1378 (11th Cir.1998) (“[W]e think it significant ... that the Venezuelan government has taken no position on whether this lawsuit *612 proceeds in the United States or Venezuela”).
Under the comity doctrine, we seek “to foster international cooperation and encourage reciprocal recognition of U.S. judgments in foreign courts.” United States v. One Gulfstream G-V Jet Aircraft, 941 F.Supp.2d 1, 8 (D.D.C.2013) (citing Oetjen v. Cent. Leather Co., 246 U.S. 297, 304, 38 S.Ct. 309, 62 L.Ed. 726 (1918) (“To permit the validity of the acts of one sovereign state to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations.”)).
Accordingly, we find that Colombia’s interest in serving as the exclusive forum for this litigation is strong.
3. Adequacy of the Colombian Forum
Finally, we turn to the adequacy of the foreign forum. Ungaro-Benages, 379 F.3d at 1238. The district court (Judge Rea) originally reasoned that “federal courts will not review foreign judgments unless the parties challenging that judgment demonstrate that it was unfair.” Mujica I, 381 F.Supp.2d at 1163 (citing Hilton, 159 U.S. at 202-03, 16 S.Ct. 139). It held that the showing of an “adequate alternative forum” was a “necessary condition to apply the doctrine of international comity.” Id. It then concluded that Colombia was an inadequate forum because Colombian law would not permit a second recovery in addition to the judgment Plaintiffs won against the Colombian government in Mario Galvis Gelves, et al. v. The Nation. See id. at 1147-48.
On remand in 2010, we directed the district court (Judge Wu) to consider the prudential exhaustion issue and the effect of the Galvis Gelves and Romero Pradilla matters, a directive which necessarily required it to reevaluate the adequacy of the alternative forum. With the benefit of the subsequent Colombian decisions, Judge Wu came to a different conclusion than Judge Rea.
As an initial matter, Judge Wu applied a burden-shifting standard: once a defendant shows that a foreign forum would have jurisdiction and would provide a remedy for a meritorious claim, the party “asserting inadequacy or delay must make a powerful showing.” Tuazon v. R.J. Reynolds Tobacco Co., 433 F.3d 1163, 1179 (9th Cir.2006); see also Carijano v. Occidental Petroleum, Corp., 643 F.3d 1216, 1225 (9th Cir.2011) (holding Peru provided an adequate alternative forum in action brought by members of Peruvian indigenous group and California nonprofit against petroleum company for environmental contamination).[25]
Under this standard, the district court held that “Occidental seems to have met its initial burden of showing the availability of local remedies.” In particular, Occidental had consented to jurisdiction in Colombia, and Plaintiffs could have proceeded in a separate suit against Defendants in Colombia at the time of their initial Colombian litigation. The court reviewed Plaintiffs’ assertion that they could not practically have brought suit in Colombia because they feared physical danger and had fled. The court noted that Occidental “at least refuted some of Plaintiffs’ contentions regarding the *613 threats to their physical safety.” It found that Plaintiffs had “pursue[d] a suit in Colombia for years, [had] filed court papers in Colombia with names, addresses, and telephone numbers, and [that] two of the Plaintiffs [had] posed for photos in connection with a 2003 newspaper interview in Colombia.” The court cited evidence in the record that showed that Plaintiffs could have filed their case directly in Bogota if they felt unsafe in Santo Domingo. It also noted that Plaintiffs did not have to be physically present in Colombia to pursue litigation against Defendants. The court concluded that Plaintiffs had not made a “powerful showing” that the foreign forum would be inadequate. Accordingly, “[i]f exhaustion were required, Occidental would probably prevail on its demonstration of availability of local remedies and the lack of futility.” The court concluded that prudential exhaustion was not required in the case but that, if it were to impose such a requirement, “it would find that Defendant Occidental ha[d] met its burden of pleading and proving the availability of local remedies and Plaintiffs’ failure to exhaust them.”
We credit Judge Wu’s finding of adequacy as superseding the earlier, contrary finding.[26] Defendants, in their previous filings and again before us, have averred that they are available for service of process and would waive any statute of limitations claims if Plaintiffs were to bring action against them in Colombian courts.[27] And “Occidental’s ‘voluntary submission to service of process’ suffices to meet the first requirement for establishing an adequate alternative forum.” Carijano, 643 F.3d at 1225 (quoting Tuazon, 433 F.3d at 1178); see also Bigio, 239 F.3d at 454 (suggesting that the existence of an alternate forum, and defendant’s amenability to suit in foreign jurisdiction, should be considered in comity analysis).
Considering the significant success Plaintiffs have had in litigation against the Colombian government and the convictions Colombia secured against the individuals *614 responsible for the Santo Domingo bombing, Plaintiffs have not made a “powerful showing” that the Colombian forum is “clearly unsatisfactory.” Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (noting such a circumstance is “rare”); see Lueck v. Sundstrand Corp., 236 F.3d 1137, 1144 (9th Cir.2001) (“The effect of Piper Aircraft is that a foreign forum will be deemed adequate unless it offers no practical remedy for the plaintiffs complained of wrong.”). To the contrary, the Colombian legal system addressed the Santo Domingo incident in two ways: through criminal sanctions and civil reparations.
Relying on the expert testimony in the record, we conclude that Plaintiffs could have originally sued Defendants in Colombia when they sued the government, but they chose not to do so. Plaintiffs pursued litigation against the Colombian government despite fears of physical danger and, even conceding Plaintiffs’ legitimate fears, they “have not shown that their ‘physical presence in [Colombia] is required to pursue the civil action.’ ” Argueta v. Banco Mexicano, S.A., 87 F.3d 320, 327 (9th Cir.1996).
Nor is there anything in the record to suggest that the Colombian courts’ decisions resulted in “manifest injustice” or violated “fundamental standards of procedural fairness.” JP Morgan Chase Bank, 412 F.3d at 428; see also LG Display Co. Ltd., v. Obayashi Seikou Co., Ltd., 919 F.Supp.2d 17, 30-31 (D.D.C.2013) (holding that a judgment is repugnant to U.S. policy, such that it may be denied comity, only if it tends to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property); Collins v. Oilsands Quest, Inc., 484 B.R. 593, 597 (S.D.N.Y.2012) (“[A] foreign judgment should generally be accorded comity if its proceedings are ‘fair and impartial.’ ”).
In light of Plaintiffs’ substantial victory against the Colombian government, they are barred by Colombian law from a secondary recovery from Defendants. But Colombia’s single-recovery rule does not render the forum inadequate. See Piper Aircraft Co., 454 U.S. at 254-55, 102 S.Ct. 252 (noting that a forum can be adequate even where there is the potential for a smaller damage award); Ungaro-Benages, 379 F.3d at 1239 (“The [alternative forum] offers victims of the Nazi era adequate remedy, even if [it] cannot provide as substantial an award as American courts.”); Gonzalez v. Chrysler Corp., 301 F.3d 377, 381-82 (5th Cir.2002) (invoking comity to hold that Mexican courts are not inadequate under doctrine of forum non conve-niens because cap on damages effectively bars lawsuit for wrongful death of a child); see also Bi, 984 F.2d at 586 (deferring to Indian jurisdiction addressing mass tort); cf. Freund, 592 F.Supp.2d at 576 (holding alternate forum adequate even though “[n]o amount of money can possibly be fair under [these] circumstances” (alterations in original) (internal citation omitted)).
Any lack of a remedy against Defendants thus stems from Plaintiffs’ failure to sue Defendants in Colombia rather than from the inadequacy of the Colombian legal system. We note, in this regard, that American jurisdictions regularly apply single-recovery rules in other circumstances without violating fundamental standards of procedural fairness. See, e.g., Duran v. Town of Cicero, Ill., 653 F.3d 632, 642 (7th Cir.2011) (“A judgment that can be read to allow a plaintiff to recover twice [from different defendants] for the same injury contains, a manifest error of law.”); Vesey v. United States, 626 F.2d 627, 633 (9th Cir.1980) (“The general theory of compensatory damages bars double recovery for *615 the same wrong. The principal situation is where joint or concurrent tortfeasors are jointly and severally liable for the same wrong. Only one complete satisfaction is permissible, and, if partial satisfaction is received from one, the liability of others will be correspondingly reduced” (internal quotation marks omitted)).
In sum, because of the strength of the U.S. government’s interest in respecting Colombia’s judicial process, the weakness of California’s interest in this case, the strength of Colombia’s interests in serving as an exclusive forum, and the adequacy of the Colombian courts as an alternative forum, we conclude that all of the claims before us are nonjusticiable under the doctrine of international comity. See Ungaro-Benages, 379 F.3d at 1239.
The crimes Plaintiffs allege are abominable, but the facts of this case nonetheless favor applying adjudicatory comity. Both nations have explicitly requested that our courts abstain from adjudicating a matter that was already litigated in Plaintiffs’ favor in an adequate alternative forum. The United States has articulated a strong interest in respecting the judicial process of Colombia and furthering the development of the rule of law there. The Colombian courts have shown themselves willing to vindicate Plaintiffs’ legitimate claims against that country’s government for its military’s acts, and the government has proven itself both willing and able to hold the individuals responsible for the bombing to account, as the Galvis Gelves and Romero Pradilla litigation show. Thus, our forbearance in this circumstance is “consistent with those notions of comity that lead each nation to respect the sovereign rights of other nations by limiting the reach of its laws and their enforcement.” Sosa, 542 U.S. at 761, 124 S.Ct. 2739 (Breyer, J., concurring).
VI. CONCLUSION
We affirm the district court’s judgment. We do not reach any of the other issues raised on this appeal.
AFFIRMED.

. We refer to Mr. Luis Mujica and the other Plaintiffs/Appellants/Cross-Appellants as "Plaintiffs” and to Occidental Petroleum and AirScan either as "Occidental” or "Defendants.” Defendant AirSean has adopted and joined Occidental’s briefing.

. A démarche is "[a]n oral or written diplomatic statement, esp[ecially] one containing a demand, offer, protest, threat, or the like.” Black's Law Dictionary 523 (10th ed.2014).

. Baker lists six alternative grounds under which a case may raise a nonjusticiable political question:
Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court’s undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
Baker, 369 U.S. at 217, 82 S.Ct. 691.

. Federal Rule of Appellate Procedure 4 directs that, in a civil case, a notice of appeal "must be filed with the district clerk within 30 days after entry of the judgment or order appealed from." Fed. R.App. P. 4(a). Exceptions, which are not relevant here, extend that period to sixty days if one of the parties is the United States or a federal agency or officer; if certain other motions are filed; or if the appellant is an inmate. See Fed. R.App. P. 4(a)(1)(B), 4(a)(4), and 4(c).

. The district court held that all of Plaintiffs’ ATS claims were properly rooted in "binding customary international láw” norms, as required to state a claim after the Supreme Court's decision in Sosa, though it dismissed Plaintiffs’ claim for “cruel, inhuman, and degrading treatment” because the consequences of permitting ATS claims based on such conduct would be "impractical.” See Mujica II, 381 F.Supp.2d at 1178-83. Because we conclude that the presumption against extraterritoriality bars the federal courts from hearing Plaintiffs’ ATS claims, we express no opinion as to whether Plaintiffs' allegations were otherwise proper under Sosa.

. The dissent reads the statements in Plaintiffs' reply brief regarding the contract between Occidental and AirScan far more credulously than we do, arguing that they constitute sufficient evidence of acts in the United States to preclude our dismissing these ATS claims. This credulous appraisal is simply mistaken. As the dissent itself acknowledges, Plaintiffs have, at most, "suggested" to the court that the contract “might have been executed within our borders.” It is not clear to us, moreover, that the bare fact that the Defendants' contract for "security services" was made in the United States would establish ATS jurisdiction in any event. In the only ATS case in which a court cited such a contract as evidence of U.S. conduct, the contract was far more specifically addressed to the activities that eventually gave rise to the plaintiffs' ATS claims. See Al Shimari v. CACI Premier Tech., Inc., 758 F.3d 516, 522 (4th Cir.2014) (finding ATS jurisdiction where, inter alia, defendant made a contract with the federal government in the United States for “interrogation-related services” that included a Statement of Work specifying activities to be performed).
The dissent also insists that "Plaintiffs are entitled to the reasonable inference” that the acts they allege occurred in Colombia "could not have occurred” without support from Defendants' "U.S. offices.” We disagree. The only pleaded facts the dissent cites to support that inference are Plaintiffs’ allegations that three participants in the bombing were employed by AirScan and that the bombing was planned at an Occidental site in Colombia. These highly circumstantial allegations do not support a sweeping inference that Defendants, through actions in the United States, took sufficient part in the bombing to be subject to ATS jurisdiction under Kiobel. See Balintulo v. Daimler AG, 727 F.3d 174, 192 (2d Cir.2013) (allegation that U.S. corporations' South African subsidiaries aided and abetted human rights violations in South Africa did not "tie[ ] the ... human rights violations to actions taken within the United States”).

. The dissent cites cases that it claims demonstrate that other courts of appeals have rejected this view of Iqbal. To the extent that any of those decisions suggests that courts retain discretion to permit discovery whenever a plaintiff has failed to satisfy Rule 8’s plausibility standard, it is simply incompatible with Iqbal and Twombly. See Iqbal, 556 U.S. at 686, 129 S.Ct. 1937 ("Because respondent’s complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise.”); Twombly, 550 U.S. at 559, 127 S.Ct. 1955 ("It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management”); see also, e.g., Vega v. Davis, 572 Fed.Appx. 611, 616 (10th Cir.2014) (rejecting plaintiffs argument that motion to dismiss should be denied due to his "lack of access to relevant information”); Carter v. DeKalb Cnty., Ga., 521 Fed.Appx. 725, 728 (11th Cir.2013) (holding that plaintiff who failed to allege plausible claim against defendants was not entitled to discovery because "discovery follows the filing of a well-pleaded complaint. It is not a device to enable the plaintiff to make a case when his complaint has failed to state a claim.” (internal quotation marks omitted)).

. Not content simply to disagree with the foregoing futility analysis, the dissent also suggests that we should not have undertaken it, leaving the question of futility of amendment to be addressed — if at all- — by the district court on a supplemented record. But as the dissent acknowledges, the parties have already been litigating this case for nearly a decade at the motion-to-dismiss stage. Judicial economy and common sense both counsel that we ought not prolong this case still further by remanding to the district court for a futility analysis when it is obvious to us that leave to amend is unwarranted. Accord Baloco v. Drummond Co., Inc., 767 F.3d 1229, 1239 (11th Cir.2014) (declining to remand ATS case to district court for amendment of complaint where post-Kiobel briefing provided "sufficient information” from which to conclude that amendment would be futile, and a remand would "needlessly extend [the] litigation, which began over eleven years ago”); see also, e.g., Sylvia Landfield Trust v. City of L.A., 729 F.3d 1189, 1196 (9th Cir.2013) (affirming denial of leave to amend where, after proposed amendments, complaint would still fail to "allege sufficient facts that amount to more than a sheer possibility that Defendants have acted unlawfully” (alteration and internal quotation marks omitted)); Dougherty v. City of Covina, 654 F.3d 892, 901 (9th Cir.2011) (affirming denial of leave to amend on futility grounds, where plaintiff "failed to allege any facts” in support of a particular legal theory and "could have identified any such fact in his briefing or argument before us, but he did not”).

. The dissent suggests that we "essentially disregard[]” Defendants' U.S. citizenship, but we are hardly dismissing Defendants’ U.S. citizenship out of hand. We do not contend that this factor is irrelevant to the Kiobel inquiry; we merely hold that it is not disposi-tive of that inquiry. But see Mastafa v. Chevron Corp., 770 F.3d 170, 189 (2d Cir.2014) ("Whether a complaint passes jurisdictional muster accordingly depends upon alleged conduct by anyone — U.S. citizen or not — that took place in the United States and aided and abetted a violation of the law of nations. A complaint cannot be ‘saved’ for jurisdictional purposes simply because a U.S. citizen happened to commit the alleged violation”).

. The dissent suggests otherwise, pointing to a concurring opinion in Kiobel in which four Justices suggested that a defendant’s U.S. citizenship would suffice for ATS jurisdiction. But that view did not command a majority and, as we discuss infra, at 594-95 & n. 11, every federal appellate and district court except one has rejected the view advocated by the dissent. We cannot accept that, by following that overwhelming body of authority, we have "improvidently extend[ed] Kiobel."

. See Cardona, 760 F.3d at 1189-90 (rejecting ATS claim even though primary defendant was a U.S. corporation, because "[a]ny tort here ... occurred outside the territorial jurisdiction of the United States”); BenHaim v. Neeman, 543 Fed.Appx. 152, 155 (3d Cir.2013) (dismissing ATS claims against multiple defendants, including two U.S. — based non *595 profits, where underlying conduct occurred in Israel); Jovic v. L-3 Servs., Inc., - F.Supp.3d -, -, 2014 WL 4748614, at *5 (N.D.Ill. Sept. 24, 2014) (dismissing ATS claims against U.S. corporations because presumption against extraterritoriality was not rebutted); Doe I v. Cisco Sys., Inc., — F.Supp.3d -, -, 2014 WL 4446381, at *5 (N.D.Cal. Sept. 5, 2014) (holding that defendant’s U.S. corporate citizenship "in and of itself is not enough to touch and concern the United States with sufficient force for the ATS to apply’’); Warfaa v. Ali, - F.Supp.3d -, -, 2014 WL 3734121, at *2-3 (E.D.Va. July 29, 2014) (dismissing ATS claims arising out of events in Somalia, brought against defendant residing in United States); Adhikari v. Daoud & Partners, 2013 WL 4511354, at *7 (S.D.Tex. Aug. 23, 2013) (dismissing ATS claim against U.S. corporation because “[t]he conduct underlying Plaintiffs’ ATS claim is entirely foreign”); Ahmed-Al-Khalifa v. Al-Assad, 2013 WL 4401831, at *2 (N.D.Fla. Aug. 13, 2013) (dismissing ATS claims against U.S. President, Congress, and U.S. corporation, because "the violations at issue all occurred outside the United States”); Giraldo v. Drummond Co., Inc., 2013 WL 3873960, at *8 (N.D.Ala. July 25, 2013) (granting summary judgment to U.S. defendants on ATS claims, where "nothing ” supported “Plaintiffs' contention that [defendant] made decisions in the United States”); Mwangi v. Bush, 2013 WL 3155018, at *4 (E.D.Ky. June 18, 2013) (noting that ATS claim against former U.S. president could not proceed because all alleged conduct occurred in Kenya); see also Doe v. Exxon Mobil Corp., — F.Supp.3d -, -, -, 2014 WL 4746256, at *12, 14 (D.D.C. Sept. 23, 2014) (“[T]he presumption against extraterritoriality is not displaced by a defendant's U.S. citizenship alone.”); cf. Balintulo, 727 F.3d at 192-93 (declining to issue writ of mandamus ordering district court to dismiss ATS claims against U.S. companies arising out of acts by their South African subsidiaries, but explaining that, "[i]n all cases, ... the ATS does not permit claims based on illegal conduct that occurred entirely in the territory of another sovereign”); Mamani v. Berzaín, 21 F.Supp.3d 1353, 1369, 2014 WL 2069491, at *11 (S.D.Fla. May 20, 2014) (holding that ATS claims against defendants residing in the United States were barred because all conduct relevant to claims "occurred on foreign soil”); In re S. African Apartheid Litig., 2013 WL 6813877, at *2 (S.D.N.Y. Dec. 26, 2013) (ordering, in case against U.S. corporations where all conduct alleged in original complaint occurred abroad, that plaintiffs amend complaint to "plausibly plead that ... defendants engaged in actions that touch and concern the United States”). But see Ahmed v. Magan, 2013 WL 4479077, at *2 (S.D.Ohio Aug. 20, 2013) (holding in the alternative that presumption against extraterritoriality was overcome by the fact that the defendant was a lawful permanent resident of the United States).

. The dissent argues that, the Bradford Opinion aside, "the principle that a sovereign may exercise jurisdiction to prescribe the conduct of its nationals outside its territory is widely recognized.” But even if that is so, the question before us is not whether the United States may regulate the conduct of U.S. nationals abroad, but whether it has done so via the ATS. Modern-day practices and norms do not help us answer that question.

. For example, we do not decide whether a California court would decline to reach these tort claims due to their extraterritorial nature, or whether the federal foreign affairs doctrine would preclude a California court from hearing these claims. See, e.g., Zschernig v. Miller, 389 U.S. 429, 440-41, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968).
The dissent believes, as we do, that Plaintiffs' state-law claims must be dismissed, but it argues that it is inappropriate for us to consider the international comity doctrine here before addressing the foreign affairs doctrine, which was one of the district court's original bases for dismissing these claims (along with the political-question doctrine). We disagree. We have not raised the question of international comity sua sponte; the district court fully considered the comity doctrine and the issue has been briefed and argued by both sides. As the dissent acknowledges, we are permitted to affirm the district court’s decision on any ground supported by the record, see, e.g., ASARCO, LLC v. Union Pac. R. Co., 765 F.3d 999, 1004 (9th Cir.2014), and we consider it important to correct the district court’s conclusion that the international comity doctrine is inapplicable to this sort of case. The dissent offers no persuasive reason why our choice to address that issue is improper, other than its disagreement with the merits of our comity analysis.

. "Case law equivocates between calling international comity a value and a rule. As a value, it reflects the sense that cases affecting foreign interests should be .decided in a manner that accounts for these interests in some way.” Eric A. Posner & Cass R. Sunstein, Chevronizing Foreign Relations Law, 116 Yale L.J. 1170, 1180 (2007). As a rule, courts “cite international comity as an explanation for' outcomes that are not explicitly driven by” other international relations doctrines, such as extraterritoriality, foreign sovereign immunity, the act of state doctrine, and the Charming Betsy canon, which holds that "an ambiguous statute will be interpreted to avoid conflicts with international law.” Id. at 1179-80.

. See also Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 937 (D.C.Cir.1984) (" ‘Comity’ summarizes in a brief word a complex and elusive concept— the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum.”); Donald Earl Childress III, Comity as Conflict: Resituating International Comity as Conflict of Laws, 44 U.C. Davis L.Rev. 11, 13 (2010) (comity "is one of the most important, and yet least understood, international law canons”).

. Some commentators have identified other strains of international comity, including so-called “executive comity,” which “provides the basis for courts to invoke principles of deference to foreign sovereignty, as in cases involving the Foreign Sovereign Immunities Act [] and act of state doctrine," see Childress III, supra, at 47, but only the first two are relevant here.

. See generally Christen Broecker, The Clash of Obligations: Exercising Extraterritorial Jurisdiction in Conformance with Transitional Justice, 31 Loy. L.A. Int'l & Comp. L.Rev. 405, 454-56 (2009) (describing how some jurisdictions require a true conflict before triggering comity).

. The dissent seizes upon this language to argue that In re Simon was “not merely a prescriptive comity case,” but also an adjudicative-comity case. We are unconvinced. The Simon court emphasized the lack of "conflicting bankruptcy proceedings” in that case not because the court was conducting an adjudicative comity analysis but because that fact proved that HSBC was in no danger of being exposed to two conflicting bankruptcy schemes — a prescriptive-comity concern. The dissent’s argument on this point also ignores our post-Simon cases — cases that are inconsistent with the dissent's reading of Simon. See infra at 601-02.

. The Ungaro-Benages court articulated different standards for "retrospective” and "prospective” claims of adjudicatory comity. “When applied retrospectively, federal courts evaluate three factors: (1) whether the foreign court was competent and used 'proceedings consistent with civilized jurisprudence,' (2) whether the judgment was rendered by fraud, and (3) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just." 379 F.3d at 1238 (citation omitted). We find it unnecessary to draw a distinction between retrospective and prospective comity in this case.

. Timberlane I articulated seven elements courts should weigh:
[1] the degree of conflict with foreign law or policy, [2] the nationality or allegiance of the parties and the locations or principal places of businesses or corporations, [3] the extent to which enforcement by either state can be expected to achieve compliance, [4] the relative significance of effects on the United States as compared with those elsewhere, [5] the extent to which there is explicit purpose to harm or affect American commerce, [6] the foreseeability of such effect, and [7] the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.
549 F.2d at 614.

.The Restatement lists a number of considerations for determining whether the exercise of jurisdiction is "unreasonable,” including:
(a) the link of the activity to the territory of the regulating state,'i.e., the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory; (b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible *604 for the activity to be regulated, or between that state and those whom the regulation is designed to protect; (c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted!;] (d) the existence of justified expectations that might be protected or hurt by the regulation; (e) the importance of the regulation to the international political, legal, or economic system; (£) the extent to which the regulation is consistent with the traditions of the international system; (g) the extent to which another state may have an interest in regulating the activity; and (h) the likelihood of conflict with regulation by another state.
Restatement (Third) of Foreign Relations Law § 403(2) (1987).

. It bears mentioning that a state’s interest will not necessarily be in the application of its own law to a case. Here-, for example, although Plaintiffs pled California causes of action, if the case were to proceed"to litigation, the district court would follow California’s conflict-of-laws methodology, which calls for a governmental-interest analysis. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). That analysis could favor the application of Colombia’s law rather than California's. See, e.g., Arno v. Club Med, Inc., 22 F.3d 1464, 1468 (9th Cir.1994) (under California’s governmental-interest analysis, French law, rather than California law, applied to plaintiff's tort claims against former employer and supervisor); McGhee v. Arabian Am. Oil Co., 871 F.2d 1412, 1422-26 (9th Cir.1989) (Saudi law, rather than California law, applied to plaintiffs' state-law claims against employer); Tucci v. Club Mediterranee, S.A., 89 Cal.App.4th 180, 194, 107 Cal.Rptr.2d 401 (2001) (Dominican Republic law, rather than California law, applied to tort and worker’s compensation claims); Hernandez v. Burger, 102 Cal.App.3d 795, 804, 162 Cal.Rptr. 564 (1980) (Mexican law, rather than California law, applied to personal-injury claims arising out of auto accident in Mexico). Thus, in stating that a court sitting in diversity should consider the state’s interests, we mean to refer primarily to the state’s interest, if any, in providing a forum or remedy for particular claims.

. Our decision in the context of the Hague Convention on the Civil Aspects of International Child Abduction is not contrary to these principles. In Asvesta v. Petroutsas, 580 F.3d 1000 (9th Cir.2009), we held that a Greek court’s decision that a child's mother had not wrongly retained a child was not entitled to comity because the Greek court clearly misapplied the provisions of the Hague Convention, completely failed to determine the child’s habitual residence, as required by the Hague analysis, and made no factual findings to support its determination that the father had failed to exercise custody rights. Id. at 1016— 17.

. Were California to manifest a specific interest in redressing claims arising out of the Santo Domingo incident or in Colombia’s drug wars more generally, its interests could well be preempted by the political branches' foreign affairs power. " '[E]ven in [the] absence of a treaty' " or federal statute, a state may violate the constitution by 'establishing] its own foreign policy.’ " Deutsch v. Turner Corp., 324 F.3d 692, 709 (9th Cir.2003) (quoting Zschernig v. Miller, 389 U.S. at 441, 88 S.Ct. 664); see also Garamendi, 539 U.S. at 396, 123 S.Ct. 2374; Movsesian v. Victoria Versicherung AG, 670 F.3d 1067, 1071-72 (9th Cir.2012).

. These cases determined the adequacy of the alternative forum for forum non conve-niens purposes, although this analysis is "equally pertinent to dismissal on the grounds of comity.” Jota, 157 F.3d at 160; see also Ford v. Brown, 319 F.3d 1302, 1304 n. 3 (11th Cir.2003) (noting that comity and forum non conveniens calculuses are "ultimately'intertwined”).

. The dissent takes us to task for our reliance on Judge Wu’s findings, dismissing Judge Wu’s determination of adequacy as "merely dictum” and the findings of a “substitute district judge.” But while we acknowledge that Judge Wu’s analysis was not addressed to the international comity doctrine, as Judge Rea's was, we cannot accept the dissent's contention that we should therefore privilege Judge Rea’s findings, which were based on a less complete record. Judge Wu was able to take into account new and important information that was unavailable to Judge Rea — namely, the subsequent developments in the Colombian proceedings — and his opinion is a valuable source of insight on this issue. The dissent does not and cannot offer any persuasive reason for ignoring Judge Wu’s opinion.

. The dissent dismisses these statements, arguing that there is "no basis” for the idea that Defendants would actually have submitted to jurisdiction in Colombia if they had been joined in the litigation there. But there is ample reason why they might have done so. Civil defendants often make such concessions in cases where they face a choice between litigating in an inconvenient and unattractive forum in the United States or a convenient forum abroad. See, e.g., Piper Aircraft Co. v. Reyno, 454 U.S. 235, 242, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (in case involving airplane crash in Scotland, defendants “agreed to submit to the jurisdiction of the Scottish courts and to waive any statute of limitations defense that might be available”); Loya v. Starwood Hotels & Resorts Worldwide, Inc., 583 F.3d 656, 664 (9th Cir.2009) (holding that Mexico was an adequate forum for forum non conve-niens purposes, where “all defendants agreed to accept service, submit to [Mexican] jurisdiction, and waive any statute of limitations defenses”). Had Defendants resisted jurisdiction in Colombia, they would have substantially weakened their position with respect to issues such as forum non conveniens and international comity if they were subsequently sued in the United States.